# UNITED STATES DISTRICT COURT
### for the
### Southern District of New York

| | |
|---|---|
| Bradley S. Freedberg, *pro se*,   ) | |
|      ) | |
|    Plaintiff,    ) | |
|      ) | |
| —————————————   ) | |
|      ) | |
|    v.     ) | Civil Action No.: |
|      ) | |
| J.P. Morgan Chase and Company,  ) | |
|      ) | |
|    and,     ) | |
|      ) | |
| Bank of America Corp.,    ) | |
|      ) | |
|    Defendants    ) | |
| —————————————   ) | |

## COMPLAINT

**COMES NOW,** Bradley S. Freedberg, Plaintiff *pro se*, and complains of J.P. Morgan Chase and Company and Bank of America Corp., Defendants, and for cause of action shows as follows:

### INTRODUCTION

This Complaint sets forth claims for relief against defendants as successors in interest to Bear Stearns and Company (Defendant J.P. Morgan) and Countrywide Financial Corp. and Merrill Lynch (Defendant Bank of America) for conduct arising during the financial crisis, and seeks remedies for damage representing the last remnants of unrecognized injury not rectified by regulators or the civil/criminal enforcement community.

Plaintiff's claims for relief that appear to be a matter of first impression in American Jurisprudence, although referenced in passing in *dicta*, summarily presented as such: if an intentional tort is directed at a corporation additionally as a conduit intentionally designed and orchestrated to directly injure shareholders individually, and foreseeably leave them without a remedy, typical direct/derivative considerations should not apply barring direct shareholder action as the unique aspects of the case and the fact that, literally and effectively, the elements of the tort in this unique situation satisfy every element of tortious interference in prospective business/economic relations of shareholders and interference in the contractual relationship between shareholders and corporation, remove the standing issue from general direct/derivative convention and precedent and/or satisfy the unique and special injury tests that allow a shareholder to proceed directly for his damage. Plaintiff is one of the only stakeholders left "holding the bag" of damage from the most notorious, illegal and self-dealing conduct that ever took place on Wall Street. Further, if a legal remedy may not be enforced, the equitable remedy of constructive trust under New York law should be applied.

In the typical case, the target of the crime is the corporation itself, and shareholders incidentally suffer, in this case the tortfeasors intentionally targeted the shareholders themselves, and the remedy of the corporation comes too late to rectify the shareholders' damages as their participatory rights were eliminated in bankruptcy.

If an arsonist burns down a house, it's arson. But, if the arsonist burns down the house for the purpose of murder, intending to kill the residents, it is first degree homicide. Failing to recognize, under direct/derivative considerations, the departure of the following factual allegations from the garden-variety corporate fraud and indirect,

derivative shareholder loss, is equating the former illustration to the latter, and stripping away from any and all legal consequence and meaning the most unique and defining element of the allegations below - that being apparently for the first time reported, a corporation was attacked for the **intended and stated purpose of harming the shareholders individually** and leaving them without a remedy for their loss.

PARTIES

1.     Plaintiff, Bradley S. Freedberg, *pro se*, is an attorney in Colorado, a C.P.A. in the State of Maryland, and a former financial adviser, registered representative, and is the owner (through his individual brokerage accounts, SEP and IRA accounts) of 1,071,000 shares, and through acquisition from at least 101 other shareholders, approximately 9,750,000, of the cancelled common stock of a public corporation that formerly traded on the New York Stock Exchange known as Ambac Financial Group, Inc. ("AFG"), the holding company for one of the former major national bond insurers/financial guarantors, Ambac Assurance Company of Wisconsin.

2.     Defendant J.P. Morgan Chase and Company ("J.P. Morgan") is the parent company of the wholly owned subsidiaries of J.P. Morgan Securities, Inc. and J.P. Morgan Chase Bank, N.A., which in turn are successors by purchase acquisition of Bear, Stearns & Co., Inc., and EMC Mortgage, LLC and EMC Mortgage Corporation.  The EMC entities were the mortgage origination arms of Bear Stearns prior to the financial crisis. Defendant J.P. Morgan Chase acquired, through its subsidiaries, the entirety of the operations of Bear Stearns (registered broker dealer) and the EMC entities on May 29, 2008, for $10 per share to Bear Stearns shareholders.

3.     Defendant Bank of America, Corp. ("Bank of America") is the parent company of the wholly owned subsidiaries Bank of America, N.A., and Bank of America Merrill Lynch, and is successor to Merrill Lynch, Pierce, Fenner & Smith, Inc. (registered broker dealer), Merrill Lynch Mortgage Lending (and Investors), Inc., and Countrywide Securities Corp. (registered broker dealer) and Countrywide Financial Corp. (a/k/a Bank of America Home Loans). Bank of America Corp. acquired the Merrill Lynch entities on January 1, 2009, and the Countrywide entities on January 11, 2008 for $4.1 Billion in stock.

<h2 style="text-align:center">JURISDICTION AND VENUE</h2>

4.     Jurisdiction is proper under 28 U.S.C. §1332(a)(1) as Plaintiff is a resident of Colorado, Defendant J.P. Morgan is a resident of New York and Defendant Bank of America is a resident of North Carolina, and the amount in controversy exceeds $75,000. Residency of defendants under 28 U.S.C. §1332 is based on state of incorporation.

5.     Venue is proper under 28 U.S.C. §1391(b)(1), as Defendants are residents (as defined by this statute as place of doing substantial business meeting minimum contacts) of the Southern District of New York, and under 28 U.S.C. §1391(b)(2), as the actions described below took place primarily within the Southern District of New York, and Plaintiff's claims accrued under New York law within the Southern District of New York.

<h2 style="text-align:center">STATEMENT OF FACTS</h2>

6.     Operative facts unfold in the few years prior to the financial crisis of the late 2000s, where on Wall Street, and in the banking community, the quest for profits and trading advantages overruled and trumped any considerations of legality.

10.    These Defendants, by and through their agents and representatives, who were at all times acting in the ordinary course and scope of their duties as employees of the Defendants, had the brilliant idea to realize trading profits as revealed below.

11.    In order to make the RMBS marketable by their broker dealers on the secondary market, the market expected that the securities be covered by bond insurance. Monoline insurance companies, such as Ambac Financial Group, Inc, (the holding company for the insurance company unit Ambac Assurance Company) were in the business of insuring bonds. RMBS bond insurance is funded by the securitization entity, holder, originator, etc., paying an insurance premium to the insurer against the risk of default. If the loans within the security portfolio start going into default, and payments are not made, the insurer has to step in and make good on bond payments, etc., for the benefit of the holder/investor of the security.

12.    The process for insuring RMBS securities is through an underwriting process. The underwriting process involved the originator disclosing the character and bona-fides of the underlying pool of mortgages, etc., the credit risk of applicants, job and income status, etc. The employees and representatives of the Defendant predecessor lenders knew full-well that their companies were using lax or non-existent individual mortgage underwriting, not verifying poor credit history, not verifying misstated income and property values, etc. Accordingly, the dilemma arose: what to do about insuring portfolios that one prominent employee knew were a "sack of sh-t" to begin with?

13.    The answer was a campaign of massive fraud against the bond insurers including Ambac Assurance. The Defendants knew that they were about to misrepresent the character of the bonds they were insuring; stating, verifying and representing that they

6

were prime, performing, verified in character mortgages, when in reality they were effectively sub-sub-prime as based on their knowledge, from due diligence based on the confidential non-public financial and consumer information provided by the residential mortgage applicants (privileged under federal law).

14.     Ambac and the other monoline insurers would (and did) rely on the representations and write the insurance against these securities (and enter into other derivative obligations on the portfolios). Binding insurance on misrepresented loans in order to make them marketable on the secondary market was not where the money was for these Defendants as any gain would be temporary - Ambac, the insurer, possessing contractual remedies that would ultimately force the repurchase of misrepresented loans by Defendants. Rather, the only real and permanent profit was to come from the ingenious trading idea based on the fact that the Defendants knew their conduct was going to render insolvent and force Ambac, and potentially other monoline insurers, out of business, especially before they could claim their pound of flesh from Defendants with their repurchase remedies.

15.     Accordingly, knowing and intending that these security portfolios would quickly go into default and result in huge insurance claim losses sufficient to bankrupt Ambac, each of these Defendants contemporaneous with the insuring of the RMBS they specifically assembled to implode, directly, through their broker-dealer proprietary stock trading desks, and/or through affiliate broker dealers, took out massive short-sell positions against the common stock of Ambac Financial Group, fully intending that their fraud would result in insolvency and bankruptcy of Ambac where and when, as they

knew, the price per share of Ambac Financial Group common stock would trend to zero and shares would be canceled.

16.     The motive and intent behind the scheme designed by Defendants' predecessors was sure-fire profit that would eclipse any and all amounts made from the loan originations themselves.  The money made from shorting the common stock of Ambac to a price of zero or nearly zero was a magnitude greater than any amount of money made from loan origination and packaging in light of the inevitable put-back remedy that Defendants understood and foresaw would come several years or a decade later.

17.     Each Defendant predecessor, by and through its agents and employees, knew and foresaw with clarity that the profits from the RMBS fraud itself would be temporary and fleeting – the insurers in general and Ambac Assurance possessing remedies for what would soon be revealed as massive fraud based on misrepresentation and contract remedies from the insuring agreements themselves.  Indeed, as intended, the only truly permanent profit that would be retained was from the insider trading on consumer mortgage applicant Non-Public Information-based short sale of Ambac stock all the way through bankruptcy and cancellation.  At one point, the profits from the short sale scheme were in the range of tens of millions of dollars each week as revealed by direct evidence of emails of Bear Stearns fixed-income traders, and as established by circumstantial evidence that Countrywide management and execs did not hesitate to utilize insider trading for the confidences they knew about borrower credit-worthiness and loan to value from privileged and private consumer information to trade and profit in the stock market.

18.     Each Defendant predecessor reasonably foresaw that: (a) the massive RMBS fraud and misrepresentation in securing bond insurance from Ambac Assurance, along

with additional derivative exposure from each fraud portfolio would bankrupt Ambac Financial Group; (b) the common stock of Ambac would over the succeeding few years after the RMBS fraud trend to zero or near zero as losses were realized; (c) the creditors of Ambac Financial Group would control the bankruptcy process; and (d) equity holders would have little and ineffective leverage in preserving their rights to participate in the insurance unit's future loss recovery efforts within the Chapter 11 or Chapter 7 bankruptcy process. For all these reasons each Defendant knew that at a foreseeable point in the future after the fraud directed at the insurer, the equity of Ambac Financial Group, Inc. would be canceled, as each schemed to profit from the share price trend to zero and cancellation of Plaintiff's shares. In essence, each Defendant knew that by insuring these portfolios - **Ambac, soon, would be "done."**

19.     Indeed the intended conspiracy of each Defendant (Bear Stearns as broker-dealer conspiring with EMC Mortgage, and Countrywide Home Loans conspiring with Countrywide Securities) merged into each Defendant by acquisition and successor liability, arrived at separately yet from a common perspective and history (although discovery might reveal some collusion between these Wall Street player/parents), came to fruition exactly as expected. In 2007, Ambac began posting quarterly multiple hundred million dollar and cumulative multi-billion dollar losses from RMBS insurance claims and derivatives from Defendants' fraud portfolios and securities insured in this scheme. The insurance regulator from the domicile of Ambac's insurance unit in Wisconsin intervened and segregated Ambac's RMBS portfolios from its municipal bond portfolios. The recorded losses beginning in 2007 and continuing through the parent company AFG's bankruptcy filing in 2010 were catastrophic, and the common stock of Ambac

Financial Group which in mid 2007 traded at close to $100 per share, began to collapse, so that by the time of bankruptcy it was a penny stock, and at cancellation on May 1, 2013, each share of 300 Million outstanding became worthless [except for participation in this lawsuit as a last vestige of value].

20.     The events from within the insurance unit of Ambac Assurance Inc. unfolded exactly as foreseen by Defendants as the general and segregated accounts and rehabilitator of Ambac Assurance recognized the fraud and filed lawsuits seeking remedies against each Defendant in multi-billion dollar recovery actions for fraud and contractual remedies.   Defendants reasonably foresaw that the money made from the RMBS transactions themselves would prove fleeting, it was the short sale scheme where the real permanent money would be made – hundreds of millions of dollars.

21.     Finally, events from within the bankruptcy of Ambac Financial Group (Case No. 2010-15973, Honorable Shelley Chapman, U.S. Bankruptcy Court, S.D.N.Y.) unfolded exactly as foreseen by Defendants.   Within the creditor controlled reorganization process, where equity interests are canceled 99% of the time, and where arguments for the appointment of an equity committee based on valuation of the insurance unit recovery actions lawsuits, in an effort to mitigate Plaintiff's losses, were, as would be reasonably foreseen, rejected by the Court even though colorable and supported, common shares were set for cancellation upon the happening of several conditions precedent, all of which were satisfied based on the announcement of emergence from bankruptcy of the reorganized debtor on May 1, 2013.   On that date, the certificate of incorporation was effectively modified and amended and the shares of stock of Ambac Financial Group

were canceled and Defendants' schemes were culminated.  Likely, many shorted shares of stock were never required to be "covered" due to the cancellation.

22.     The short-sales of Ambac stock alleged, while facially illegal under Rule 10b-5 misappropriation theories as based on non-public loan loss calculations derived from confidential non-public information provided by consumer residential mortgage applicants whose private information was protected by federal law against re-disclosure or **reuse for *anything* other than the loan-related transactions** (Gramm-Leach Bliley Act [GLBA], Public Law 106-102, 113 Stat. 1338, 12 U.S.C. §24a, 248b, 1831v-y, 1848a, 2908, 15 U.S.C. §80b-10a, and amending 12 U.S.C. §78 and 377, and 15 U.S.C. §80), and which have gone un-prosecuted criminally or administratively (rulemaking under the GLBA clearly governs and regulates the conduct of Defendants and predecessors, and employees and agents at all times relevant, by the S.E.C. [Regulation S-P, 17 C.F.R. Part 48], the F.D.I.C., the F.T.C. [16 C.F.R. Part 313 and 314]), are averred as such as neither actionable nor operative themselves.  Rather these trades are only referenced as evidence of the intent of the insurance fraud to cause harm to shareholders directly, intent to cause and the reasonable foreseeability of the bankruptcy and share cancellation.  The trades were merely reflective of the intent to harm the corporation through insurance claim loss payable to third-party investors as simply a temporary tool to cause permanent harm to shareholders by the trend to zero and ultimately share cancellation, i.e., the temporary (inevitably reversible) harm to the insurer, Defendants **intended** as a conduit for permanent, unique and special injury to canceled shareholders.  ***Stated more basically, the objective of this scheme was not the arson of Ambac Assurance Company, it was the homicide of the common stock of pre-reorganization Ambac Financial Group.***

23.     Thus, as reasonably foreseen by Defendants' predecessors (and Defendants as successors and alter-egos of their predecessors, who also individually after acquisition took additional proprietary short positions against Ambac continuing the chain of intent, conspiracy and causation) **with pre-reorganization shareholders removed from the equation** of stakeholders of post-reorganized debtor Ambac, Defendants could obtain much sweeter deals on their put-back and remediation obligations, i.e., J.P. Morgan paying $1B in settlement with Ambac on January 26, 2016 for an exposure of more than 1.5X the payment.  This fact is likely a harbinger of a similar 60 cents on the dollar settlement by Bank of America on its combined $3B exposure.

24.     The only stakeholders remaining in the reorganized Ambac entity are the bondholders who received bonds and warrants and new equity shares, the rehabilitator (Office of Insurance Commissioner, State of Wisconsin "OCI" that segregated Ambac into two units and issued $2.2B of surplus notes), and the surplus note holders and policy holders themselves.  But for the $5 Billion in losses occasioned by the corporate fraud of Defendants, Plaintiff, and indeed all shareholders, would not have been damaged as the bankruptcy would never have been filed and the segregation (and resulting dividend restriction from insurance unit subsidiary to the publicly-traded parent) would have never occurred.  But for the fact (of which Defendants were aware) that the insurance claims on the fraud losses were enough to render Ambac insolvent, bankruptcy would not have been filed, shareholders would not have been canceled, and Defendants would have been forced to tender their put-back and remediation obligations at full value, $4-5 Billion combined.  Plaintiff and all shareholders would have been in the money by $900M in a runoff (the status quo measure of damage ignoring the continuation of the going concern).

But for the conduct of Defendants, each shareholder lost the value of $3 per share in runoff (again, the status-quo measure of damage).

## SUMMARY OF RELIEF REQUESTED

25.     Accordingly, Plaintiff, as "first party," has suffered damages in the amount of $31,000,000, and seeks compensation for the interference in and disruption of whatever legally cognizable property, economic, or contract rights he had as shareholder in Ambac Financial Group, as the "second party," flowing from the intentional acts and wrongful/fraudulent conduct directed at the "second party" by the Defendants, as "third parties," **intentionally orchestrated to harm the first-party**. Again, the conduct described above satisfies, *prima facie*, each and every requirement of tortious interference claim elements -- as the essential element is the third parties' **intent** to cause harm to the first party by fraud directed at the second party, a feature that never exists in garden-variety corporate fraud cases and which has never been evaluated before by tribunals concerned with direct/derivative shareholder standing - that being, the **intent** was to harm the shareholders by wiping them out in bankruptcy. ONLY in a wipe-out scenario is the shareholder directly harmed as otherwise participatory rights remain intact.

26.     If this Complaint survives motions, as it should as a matter of first impression in American Jurisprudence, and concerning a matter of significant public interest and outrage, for which regulators and enforcement community have either negligently, recklessly, or corruptly ignored, Plaintiff will retain willing counsel, and perhaps expand the scope of the remedy to other claims for relief beyond his *pro se* ability to prosecute, such as racketeering and conspiracy, for himself and for others similarly situated.

27.     Plaintiff demands a trial by jury on all issues of fact.

## CLAIMS FOR RELIEF

### I.

FIRST CLAIM FOR RELIEF
TORTIOUS INTERFERENCE IN BUSINESS RELATIONS / PROSPECTIVE
ECONOMIC ADVANTAGE

28.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 27 above, as if set forth at length hereunder.

29.    Plaintiff, as a common equity share owner of the former Ambac Financial Group, Inc. pre-reorganization corporation, possessed an identity distinct and separate from the corporation itself, i.e., shareholders of a corporation are not one and the same as the corporation itself, and have legal, distinct and separate identities from that of the entity as defined by its Delaware certificate of incorporation.  Consequently, Plaintiff had a legal, business and economic participatory relationship with Ambac Financial Group, Inc. as a distinct party under the certificate of incorporation of Ambac (as supplemented by by-laws and any shareholder agreements) and as reflected by the common stock share certificates owned by Plaintiff on the day prior to the emergence from Chapter 11 of Ambac and cancellation of its common shares of stock.

30.    The participatory rights of Plaintiff as a shareholder included participation in the going concern of the corporation, the right to sell shares in the open market, the right to dividends in the future, the right to vote, and to generally participate derivatively in future litigation recoveries of the entity.

31.    Defendants (as successors and alter-egos of Defendants' predecessors) knew that Ambac Financial Group, Inc. had common shareholders, both at the time of origination of

the RMBS fraud and the opening of short-sell positions, the filing of bankruptcy, and on cancellation of shares; during the entire timeline set forth above.

32.     Defendants' RMBS insurance application defrauding of and misrepresentation to Ambac Assurance represented an intentional "wrongful" act **designed** to force Ambac Financial Group, Inc. into bankruptcy where common shares would be cancelled in disruption of the legal / business / prospective economic relationship between the Plaintiff and Ambac Financial Group, Inc.

33.     On May 1, 2013, the common shares of Ambac Financial Group, Inc. were canceled in bankruptcy and the relationship between Plaintiff and Ambac Financial Group, Inc. was permanently disrupted.

34.     As a result of Defendants' tortious interference in prospective economic advantage and interests or business relations, Plaintiff suffered damage.

II.

SECOND CLAIM FOR RELIEF
TORTIOUS INTERFERENCE IN PROPERTY RIGHTS

35.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 27 above, as if set forth at length hereunder.

36.     Plaintiff, as a common equity share owner of the former Ambac Financial Group, Inc. pre-reorganization corporation, possessed an property right in the corporation itself, i.e., shareholders of a corporation are not one and the same as the corporation itself, and have a legal, distinct and separate property interest in the entity as defined by the certificate of incorporation. Consequently, Plaintiff had a property right in Ambac under the certificate of incorporation of Ambac (as supplemented by by-laws and any

shareholder agreements) and as reflected by the common stock share certificates owned by Plaintiff on the day prior to the emergence of Ambac from Chapter 11 and cancellation of its common shares of stock.

37.     The participatory property rights of Plaintiff as a shareholder included participation in the going concern of the corporation, the right to sell shares in the open market, the right to dividends in the future, the right to vote, and generally participate derivatively in future litigation recoveries of the entity.

38.     Defendants (as successors and alter-egos of Defendants' predecessors) knew that Ambac Financial Group, Inc. had common shareholders, both at the time of origination of the RMBS fraud, the opening of short-sell positions, the filing of bankruptcy, and on cancellation of shares, during the entire timeline set forth above.

39.     Defendants' RMBS insurance application defrauding of and misrepresentation to Ambac Assurance represented an intentional act **designed** to force Ambac Financial Group, Inc. into bankruptcy where common shares would be cancelled in disruption of the property rights Plaintiff possessed in his share certificates.

40.     On May 1, 2013, the common shares of Ambac Financial Group, Inc. were canceled in bankruptcy and the property rights of Plaintiff in Ambac Financial Group, Inc. were destroyed.

41.     As a result of Defendants' tortious interference in property rights, Plaintiff suffered damage.

III.

THIRD CLAIM FOR RELIEF
TORTIOUS INTERFERENCE IN CONTRACT

42.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 27 above, as if set forth at length hereunder.

42.     Plaintiff as shareholders of record on the day before May 1, 2013 was a party to a contract with the corporation Ambac Financial Group, Inc. by virtue of the certificate of incorporation of Ambac Financial Group, a Delaware Corporation (as supplemented by by-laws and any shareholder agreements).  Delaware and New York law provide that the certificate of incorporation is a contract between shareholders and the corporate entity.

43.     Defendants knew of the contractual relationship between shareholders and the corporation and used wrongful and fraudulent means to interfere in the performance of the contract between the parties. The RMBS fraud directed at Ambac Assurance was designed to drive AFG into bankruptcy where it would foreseeably result in the cancellation of the then existing common shares and interference in by modification of the agreement(s).

44.     Defendants intended that their wrongful conduct would interfere in the performance of the contract(s), as desiring the common shares to be worthless and canceled, the ultimate goal of their wrongful conduct.

45.     The performance of the contract(s) were frustrated and interfered with (by bankruptcy and share cancellations).  The object of the agreement(s), participatory rights of an entire class of shareholders, was obliterated and rendered impossible to perform.

46.     Plaintiff suffered damage by voided participation in the going concern by tortious interference in the performance of the parties under the agreement(s) of the certificate of incorporation, by-laws, and any shareholder agreements.

IV.

FOURTH CLAIM FOR RELIEF
CONSTRUCTIVE TRUST - EQUITABLE RELIEF UNDER NEW YORK LAW

47.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 27 above, as if set forth at length hereunder.

48.     The conduct alleged above is rife with fraud, self-dealing, illegality and securities fraud, whether prosecuted or not.  Certainly, the damages alleged by Plaintiff flow from and were proximately caused by Defendants' wrongful conduct orchestrated in a unique construct.

49.     Sitting in equity, under the law of the State of New York, this honorable Court possesses broad equitable powers to right a wrong by fashioning a remedy that does not fit into tight, legal parameters.

50.     At the very least, Defendant J.P. Morgan Chase and Company, as a successor Defendant, and as evidenced by direct evidence revealing at least $55,000,000 in short-sale trading profits of Ambac stock in a mere matter of weeks (and likely much more), and Defendant Bank of America as successor to Countrywide Securities, Inc. circumstantially, derived profits and gains in a wrongful fashion as a part of their scheme to destroy the company in which Plaintiff possessed equity.

51.    While not asserting a stock-trading related claim for relief, Plaintiff as a canceled shareholder owning 3.6% of the outstanding shares of the pre-reorganized Ambac entity, possesses the legal rights incidental to that ownership.

52.    Consequently, Plaintiff seeks the imposition of an equitable constructive trust against 3.6% of the wrongfully obtained short-sale trading profits derived from the described scheme, which as a matter of conscience and equity, would serve the interests of justice in redress for Plaintiff's loss as a member of the class of the only people left "holding the bag" of damage, and standing in the shoes of every security holder of the shares in the chain of possession before him, whose economic demise resulted in Defendants' illegal insider trading windfall.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays and requests that Defendants be cited to answer and appear herein, and that upon final hearing of this matter before a jury, Plaintiff have and recover damages as requested in Counts I, II and III of this Complaint, and invoke from the Court its equitable powers as requested in Count IV, and such other and further relief, in law and in equity, that justice may required, plus all costs of Court as allowed.

Respectfully Submitted,

Bradley S. Freedberg, Plaintiff *pro se*
1888 Sherman Street, #200
Denver, CO  80203
bradfreedberglaw@aol.com
Phone:  (303) 892-0900
FAX:    (303) 446-0803

Dated this 27th day of April, 2016 in Denver, Colorado.

JS 44C/SDNY
REV. 2/2016

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Bradley S. Freedberg, pro se | J.P. Morgan Chase and Company and Bank of America Corp. |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER | ATTORNEYS (IF KNOWN) |
|---|---|
| Bradley S. Freedberg, pro se<br>1888 Sherman Street, #200<br>Denver, CO  80203 | |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Tortuous Interference in Contract and Prospective Economic Advantage,  Civil R.I.C.O.,  Equitable Claims, New York State Law

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No[x] Yes[ ] Judge Previously Assigned

If yes, was this case  Vol.[ ]  Invol.[ ]  Dismissed.  No[ ]  Yes[ ]  If yes, give date _____ & Case No. _____

Is THIS AN INTERNATIONAL ARBITRATION CASE?      No [x]      Yes [ ]

*(PLACE AN [x] IN ONE BOX ONLY)*      NATURE OF SUIT

### TORTS

### ACTIONS UNDER STATUTES

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY/ | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | PHARMACEUTICAL PERSONAL | [ ] 625 DRUG RELATED | [ ] 422 APPEAL | [ ] 375 FALSE CLAIMS |
| [ ] 120 MARINE | [ ] 315 AIRPLANE PRODUCT | [ ] 367 HEALTHCARE/ | SEIZURE OF PROPERTY | 28 USC 158 | [ ] 376 QUI TAM |
| [ ] 130 MILLER ACT | LIABILITY | INJURY/PRODUCT LIABILITY | 21 USC 881 | [ ] 423 WITHDRAWAL | [ ] 400 STATE |
| [ ] 140 NEGOTIABLE | [ ] 320 ASSAULT, LIBEL & | [ ] 365 PERSONAL INJURY | [ ] 690 OTHER | 28 USC 157 | REAPPORTIONMENT |
| INSTRUMENT | SLANDER | PRODUCT LIABILITY | | | [ ] 410 ANTITRUST |
| [ ] 150 RECOVERY OF | [ ] 330 FEDERAL | [ ] 368 ASBESTOS PERSONAL | | PROPERTY RIGHTS | [ ] 430 BANKS & BANKING |
| OVERPAYMENT & | EMPLOYERS' | INJURY PRODUCT | | [ ] 820 COPYRIGHTS | [ ] 450 COMMERCE |
| ENFORCEMENT | LIABILITY | LIABILITY | | [ ] 830 PATENT | [ ] 460 DEPORTATION |
| OF JUDGMENT | [ ] 340 MARINE | | | [ ] 840 TRADEMARK | [x] 470 RACKETEER INFLU- |
| [ ] 151 MEDICARE ACT | [ ] 345 MARINE PRODUCT | PERSONAL PROPERTY | | | ENCED & CORRUPT |
| [ ] 152 RECOVERY OF | LIABILITY | [x] 370 OTHER FRAUD | | SOCIAL SECURITY | ORGANIZATION ACT |
| DEFAULTED | [ ] 350 MOTOR VEHICLE | [ ] 371 TRUTH IN LENDING | | | (RICO) |
| STUDENT LOANS | [ ] 355 MOTOR VEHICLE | | LABOR | [ ] 861 HIA (1395ff) | [ ] 480 CONSUMER CREDIT |
| (EXCL VETERANS) | PRODUCT LIABILITY | | | [ ] 862 BLACK LUNG (923) | [ ] 490 CABLE/SATELLITE TV |
| [ ] 153 RECOVERY OF | [ ] 360 OTHER PERSONAL | PERSONAL PROPERTY | [ ] 710 FAIR LABOR | [ ] 863 DIWC/DIWW (405(g)) | |
| OVERPAYMENT | INJURY | [x] 380 OTHER PERSONAL | STANDARDS ACT | [ ] 864 SSID TITLE XVI | [ ] 850 SECURITIES/ |
| OF VETERAN'S | [ ] 362 PERSONAL INJURY - | PROPERTY DAMAGE | [ ] 720 LABOR/MGMT | [ ] 865 RSI (405(g)) | COMMODITIES/ |
| BENEFITS | MED MALPRACTICE | [ ] 385 PROPERTY DAMAGE | RELATIONS | | EXCHANGE |
| [ ] 160 STOCKHOLDERS | | PRODUCT LIABILITY | [ ] 740 RAILWAY LABOR ACT | | |
| SUITS | | | [ ] 751 FAMILY MEDICAL | FEDERAL TAX SUITS | [ ] 890 OTHER STATUTORY |
| [ ] 190 OTHER | PRISONER PETITIONS | | LEAVE ACT (FMLA) | | ACTIONS |
| CONTRACT | [ ] 463 ALIEN DETAINEE | | | [ ] 870 TAXES (U.S. Plaintiff or | [ ] 891 AGRICULTURAL ACTS |
| [ ] 195 CONTRACT | [ ] 510 MOTIONS TO | | [ ] 790 OTHER LABOR | Defendant) | |
| PRODUCT | VACATE SENTENCE | | LITIGATION | [ ] 871 IRS-THIRD PARTY | [ ] 893 ENVIRONMENTAL |
| LIABILITY | 28 USC 2255 | | [ ] 791 EMPL RET INC | 26 USC 7609 | MATTERS |
| [ ] 196 FRANCHISE | [ ] 530 HABEAS CORPUS | | SECURITY ACT (ERISA) | | [ ] 895 FREEDOM OF |
| | [ ] 535 DEATH PENALTY | | | | INFORMATION ACT |
| | [ ] 540 MANDAMUS & OTHER | | | | [ ] 896 ARBITRATION |
| REAL PROPERTY | CIVIL RIGHTS | | IMMIGRATION | | [ ] 899 ADMINISTRATIVE |
| [ ] 210 LAND | | | [ ] 462 NATURALIZATION | | PROCEDURE ACT/REVIEW OR |
| CONDEMNATION | [ ] 440 OTHER CIVIL RIGHTS | | APPLICATION | | APPEAL OF AGENCY DECISION |
| [ ] 220 FORECLOSURE | (Non-Prisoner) | | [ ] 465 OTHER IMMIGRATION | | [ ] 950 CONSTITUTIONALITY OF |
| [ ] 230 RENT LEASE & | [ ] 441 VOTING | | ACTIONS | | STATE STATUTES |
| EJECTMENT | [ ] 442 EMPLOYMENT | | | | |
| [ ] 240 TORTS TO LAND | [ ] 443 HOUSING/ | PRISONER CIVIL RIGHTS | | | |
| [ ] 245 TORT PRODUCT | ACCOMMODATIONS | [ ] 550 CIVIL RIGHTS | | | |
| LIABILITY | [ ] 445 AMERICANS WITH | [ ] 555 PRISON CONDITION | | | |
| [ ] 290 ALL OTHER | DISABILITIES - | [ ] 560 CIVIL DETAINEE | | | |
| REAL PROPERTY | EMPLOYMENT | CONDITIONS OF CONFINEMENT | | | |
| | [ ] 446 AMERICANS WITH | | | | |
| | DISABILITIES -OTHER | | | | |
| | [ ] 448 EDUCATION | | | | |

*Check if demanded in complaint:*

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $ 22,000,000+  OTHER _____

*Check YES only if demanded in complaint*
JURY DEMAND: [x] YES [ ] NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.? IF SO, STATE:

JUDGE _____    DOCKET NUMBER _____

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

*(PLACE AN x IN ONE BOX ONLY)*                                    **ORIGIN**

[x] 1 Original    [ ] 2 Removed from    [ ] 3 Remanded    [ ] 4 Reinstated or    [ ] 5 Transferred from   [ ] 6 Multidistrict    [ ] 7 Appeal to District
   Proceeding         State Court       from        Reopened        (Specify District)     Litigation          Judge from
                      [ ] a. **all parties represented**    Appellate                                        Magistrate Judge
                                     Court                                             Judgment
                      [x] b. **At least one**
                            **party is pro se.**

*(PLACE AN x IN ONE BOX ONLY)*          **BASIS OF JURISDICTION**          ***IF DIVERSITY, INDICATE***
[ ] 1 U.S. PLAINTIFF    [ ] 2 U.S. DEFENDANT    [ ] 3 FEDERAL QUESTION    [x] 4 DIVERSITY         ***CITIZENSHIP BELOW.***
                                     (U.S. NOT A PARTY)

### CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [x] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [x] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)
1888 Sherman Street, #200, Denver, CO  80203 (Denver County)

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

J.P. Morgan Chase and Company, 270 Park Avenue, New York, NY 10017 (New York County)
Bank of America 100 N. Tryon St Charlotte NC 28255 (Mecklenberg County)

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN
THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    [ ] WHITE PLAINS    [x] MANHATTAN
              (DO NOT check either box if this a PRISONER PETITION/PRISONER CIVIL RIGHTS COMPLAINT.)

DATE              SIGNATURE OF ATTORNEY OF RECORD         ADMITTED TO PRACTICE IN THIS DISTRICT
                                                 [ ] NO
RECEIPT #                                            [ ] YES (DATE ADMITTED  Mo. _____  Yr. _____)
                                                 Attorney Bar Code #

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| Bradley S. Freedberg, pro se<br><br>_____<br>*Plaintiff(s)*<br>v.<br>J.P. Morgan Chase and Company, and Bank of<br>America Corp.<br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)   Civil Action No.<br>)<br>)<br>)<br>)<br>)<br>) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* J.P. Morgan Chase and Company, 270 Park Avenue, New York, NY  10017

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                          *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____

                                         _____
                                                    *Server's signature*

                                         _____
                                                    *Printed name and title*

                                         _____
                                                    *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Southern District of New York

| | |
|---|---|
| Bradley S. Freedberg, pro se <br><br> _____ <br> *Plaintiff(s)* <br> v. <br> J.P. Morgan Chase and Company, and Bank of America Corp. <br><br> _____ <br> *Defendant(s)* | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. <br> ) <br> ) <br> ) <br> ) <br> ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Bank of America Corp., 100 N. Tryon Street, Charlotte, NC  28255

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                              *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

**PROOF OF SERVICE**

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc: